25-707-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2025

(Argued: January 30, 2026      Decided: July 23, 2026)

Docket No. 25-707-cv

───────────────────────

SEAN R. RAYMOND SR.,
*Plaintiff - Appellant,*

v.

1199SEIU NATIONAL BENEFIT FUND,
*Defendant - Appellee.*

───────────────────────

Before:      SACK AND PÉREZ, *Circuit Judges*, PRESKA, *District Judge.*[*]

Plaintiff-Appellant Sean R. Raymond Sr. ("Raymond") appeals from a July 20, 2023 order of the United States District Court for the Southern District of New York (George B. Daniels, *J.*) granting Defendant-Appellee 1199SEIU National Benefit Fund ("NBF") summary judgment as to Raymond's failure-to-accommodate claim, and from the court's February 24, 2025 order denying Raymond's motion for a new trial under Rule 59(a) as to his disability discrimination claim.

For the reasons set forth below, we agree with Raymond that the district court erred in granting summary judgment to NBF on his failure-to-accommodate claim. However, the district court's denial of Raymond's 59(a) motion as to his disability discrimination claim is not reviewable by this Court. We therefore **VACATE** the district court's entry of summary judgment, **DISMISS** the appeal of the district court's order on Raymond's Rule 59(a) motion, and **REMAND** for further proceedings consistent with this opinion.

---

[*] Judge Loretta A. Preska, of the United States District Court for the Southern District of New York, sitting by designation.

LAUREN NOELLE BECK AND CHELSEA SINCOX (Joseph Bacchi, *on the brief*), Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Appellant*;

RACHEL S. FISCHER (Patrick J. Lamparello, *on the brief*), Proskauer Rose LLP, New York, NY, *for Appellee.*

SACK, *Circuit Judge*:

For nearly 30 years, Plaintiff-Appellant Sean R. Raymond Sr. ("Raymond") worked for Defendant-Appellee 1199SEIU National Benefit Fund ("NBF"). In his most recent role as Outreach Coordinator, Raymond was required to drive to various healthcare facilities in an assigned area on Long Island to give presentations to facility workers on union benefits and pensions. During his employment, Raymond developed a serious vein condition, for which he was hospitalized multiple times. As a result of this illness, Raymond's doctor first approved him to work with "light restrictions," meaning Raymond had to avoid prolonged sitting and driving, and after his condition worsened, to avoid sitting and driving for longer than thirty minutes at a time. Raymond notified NBF of his limitations, and NBF responded by removing from his service area the four facilities that were furthest away from Raymond's home—leaving many facilities to which it would take Raymond longer than thirty minutes to drive. Raymond

2

protested and requested that NBF reassign him to a different area. NBF refused.

Eventually, when Raymond could not return to work under NBF's conditions,

NBF terminated his employment. Raymond sued, alleging that (1) NBF failed to

provide him with reasonable accommodations as required by the Americans

with Disabilities Act ("ADA") and that (2) NBF engaged in unlawful disability

discrimination when it terminated him.

The district court (George B. Daniels, *J.*) granted summary judgment to

NBF on the reasonable accommodation claim, finding that NBF adequately

accommodated Raymond when it removed the four farthest stops from his route,

and that Raymond did not demonstrate that he had requested any other

plausible reasonable accommodation. The district court allowed the disability

discrimination claim to go to trial, where a jury ruled for NBF. After the verdict,

Raymond filed a Rule 59(a) motion for a new trial. He argued that the jury's

verdict was not supported by the weight of the evidence because NBF did not

accommodate Raymond, and that it was clear that NBF required Raymond to

either return to work "without restriction" or be terminated, which is a *per se*

violation of the ADA. The district court denied this motion, concluding that a

reasonable jury could have found that NBF did not fire Raymond due to his disability. Raymond appeals both decisions.

For the reasons set forth below, we agree with Raymond that the district court erred in granting summary judgment to NBF on his failure-to-accommodate claim. However, the district court's denial of Raymond's Rule 59(a) motion as to his disability discrimination claim is not reviewable by this Court. We therefore **VACATE** the district court's entry of summary judgment, **DISMISS** the appeal of the district court's order on Raymond's Rule 59(a) motion, and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

Plaintiff-Appellant Sean R. Raymond Sr. was employed by Defendant-Appellant National Benefit Fund for nearly 30 years. He began his employment in various administrative roles, first working in the supply room and the mail room, and then at a desk job in the claims department. In 2003, Raymond was promoted to Outreach Coordinator. Outreach coordinators engage with healthcare workers to provide union members with information on pension applications and estimates and give presentations to them about those benefits.

As part of their job, outreach coordinators frequently visit healthcare facilities to discuss these issues with union members.  Usually, a coordinator will visit one facility per day, averaging visits to three or four facilities per week.  Due to the travel requirements of the job, the outreach coordinator job description states that employees in this position must be able to "[s]it[] in a normal seated position for extended periods of time."  Joint App'x 166.

Outreach coordinators each service nursing homes, hospitals, and other medical and care facilities within a specific zone.  Each coordinator is assigned to a specific zone by the Director of Outreach, who was, at all relevant times, Frank Sossi ("Sossi").[1]

After his promotion to Outreach Coordinator, Raymond serviced a variety of zones across New York State, including in upstate New York, Long Island, Brooklyn, and Queens.  Between 2010 and 2015, Raymond was at times assigned to Area I, which covered most of Long Island, and at other times to Area J, which covered the borough of Queens and western Long Island.  Because Area J

---

[1] It is unclear how many different zones outreach coordinators service, but it appears there are at least Areas A–J, presumably meaning that there are at least 10 different zones to which a coordinator could be assigned.

covered the most nursing homes—nearly 50—Sossi sometimes staffed the Area

with two coordinators who would split the zone. When Raymond worked Area

J during this time period, he was assigned to only half of the zone, and he could

reach most of the facilities in that half in a forty-five minute drive or less from his

home in Elmont, New York. Area I, however, extends to the far eastern tip of

Long Island, meaning that visiting some of the facilities required Raymond to

drive for several hours from his home.

In 2010, Raymond was diagnosed with superficial thrombophlebitis, which

can cause "painful, sometimes life-threatening blood clots." Joint App'x 254. On

June 7, 2010, Raymond informed NBF of his diagnosis by sending his employer a

notice and proof of claim for disability benefits. Raymond continued his role as

Outreach Coordinator after his diagnosis, and he worked in this role for five

years thereafter without incident.

In August 2015, Raymond suffered a pulmonary embolism, which caused

life-threatening blood clots that required hospitalization. He was then placed on

short-term disability leave for twenty-six weeks, until January 2016. When he

returned to work in January, Raymond provided NBF with a doctor's note that

stated that he should work with "light duties restrictions," meaning "half of the

standing, walking and lifting that he normally does." Joint App'x 696. It also

noted that "[s]itting [was] advisable for a period of 4 weeks" before Raymond

could "return to normal job duties." *Id*. Because "[Raymond] mostly sits," Sossi

acknowledged in an internal email chain that NBF "c[ould] accommodate the

request" to limit Raymond's time on his feet. Joint App'x 698. Cleared to return

to work with these restrictions, Raymond resumed servicing half of Area J. He

manned this zone for two years without any problems.

In 2017, one of Raymond's colleagues left NBF, leaving an area without an

outreach coordinator. NBF informed Sossi, who managed coordinator

assignments, that it would not authorize him to hire someone new to fill this

position. To fix this coverage gap, Sossi shuffled around the existing outreach

coordinators. Area J—consisting of 50 facilities fairly close together in Queens

and on the western part of Long Island—which was previously serviced by two

coordinators was now to be serviced by only one. Sossi gave this new Area J

assignment to an outreach coordinator named Lillian Ferraro, with whom he had

previously had a romantic relationship. Sossi assigned Raymond to Area I,

which although it contains fewer facilities, covers much more territory than Area

J.  Joint App'x 249, 2626.[2]



In December 2017, Raymond emailed his supervisors, including Sossi, to

express concerns about his reassigned route.  He attached to his email a doctor's

note that stated that "[i]t should be clearly evident that there are restrictions in

his physical activities not only to diminish the recurrence of genetically provoked

deep thrombophlebitis of the legs[,] but also life threatening pulmonary

---

[2] Although Sossi and NBF never admitted that Area J requires far shorter drives than Area I, the map of Area I and Area J shops above makes that clear.

embolism." Joint App'x 2548. The note also informed NBF that some of the doctor's instructions should be "strictly followed," such as to "[a]void prolong[ed] walking, standing, sitting (driving) and squatting." *Id.* In response, Sossi acknowledged in an internal email that two of Raymond's assigned facilities were more than ninety minutes away from his home, five were between an hour and seventy-five minutes away, nine under an hour, and fifteen less than thirty minutes from his home. And, Sossi wrote, because "[t]he job responsibility for an Outreach Coordinator states clearly that there will be extensive travel in the Tri-State area, . . . if [Raymond] or anyone can't meet that requirement then he may want to reconsider being an Outreach Coordinator." Joint App'x 2636.

Despite his concerns, Raymond began servicing Area I on January 8, 2018. On January 12, 2018, Sossi informed Raymond that the four facilities furthest from his house would be serviced by a different outreach coordinator. Raymond worked Area I—minus the four furthest facilities—without incident for six months.

Raymond's condition worsened, however, and, in the spring of 2018, he was hospitalized. On June 20, 2018, Raymond sent NBF a letter from his doctor explaining that Raymond's "left deep venous system . . . is permanently

damaged by the phlebitis, so much so that the blood in the left leg is going in reverse instead of draining towards his heart when he is standing." Joint App'x 724. Due to the permanent damage, the doctor "strongly recommend[ed] that [Raymond] should absolutely avoid prolonged continuous standing, walking, sitting or driving without elevating his legs for more than thirty minutes continuously." *Id*. Raymond briefly returned to work, but shortly thereafter, he was hospitalized again, during which his doctor recommended he take short-term disability leave. NBF did not respond to the doctor's note or otherwise contact Raymond to discuss its contents.

Sometime on or around July 27, 2018, Raymond again complained to NBF about his area reassignment and the length of his drives. Although it is not clear exactly what was said, at the very least, he communicated that the new route required "[m]uch longer driving" of sometimes two to three hours, that he "[i]nformed Frank [Sossi]" that he "could not do the amount of driving due to [m]edical reasons" and provided a doctor's note but was "reassigned anyway," and that his leg vein is "now dead." Joint App'x 736. Still having not received a response, on July 31, Raymond sent a letter to NBF's human resources department ("HR") requesting that HR respond to the doctor's note. NBF's

10

Assistant Director of HR Kevin Hurley then called him. Raymond asked Hurley if he could have his old assignment back—in other words, he asked to be assigned back to Area J, which required more frequent but fewer drives than his current Area I assignment. Hurley denied this request, explaining that NBF had already made special exceptions for Raymond when they removed the four furthest facilities from his route.

Following the advice of his doctor, Raymond began short-term disability leave on August 6, 2018. While on leave, his doctor informed NBF's HR that Raymond could return to work as long as he "[a]void[ed] prolonged standing/sitting/squatting." Joint App'x 2615. HR informed Raymond's boss, Sossi, of these limitations via email. Sossi responded five minutes later, explaining that "[t]he position requires sitting, standing and driving for a prolonged period of time" and so "[u]nfortunately [NBF] can't accommodate this request." *Id.*

After this exchange, NBF insisted that Raymond could only return to work if he had a "clearance note stating . . . no restrictions." Joint App'x 2520; *see also id.* at 2542 (HR explaining that Raymond "can only come back to work . . . if

[NBF] ha[s] medical clearance from his doctor . . . with no restrictions"); *id.* at 2555 (Hurley asking if Raymond was "cleared to return with no restrictions").

On January 17, 2019, Raymond emailed Richard Kral, NBF's HR Manager, asking NBF to implement the "reasonable accommodations" that his doctor's note of January 15 had outlined. Joint App'x 191–92. Kral responded that Raymond's "request was discussed with department management[,] and a determination was made that the Fund could not accommodate the request given the fact that these restrictions would negatively impact the ability for [Raymond] to perform the essential functions of [his] job as an Outreach Coordinator." *Id.* at 191.

On February 1, 2019, Raymond sent a letter to NBF's HR Director, Richard Whitter, asking Whitter to reconsider NBF's decision to not accommodate his medical restrictions. In that letter, Raymond explained that company policy states that "an employee with a disability should consult with Human Resources to candidly discuss possible accommodations," and that "the organization will conduct an investigation to identify possible accommodations that will help eliminate the limitations resulting from the disability." Joint App'x 195. He asked whether NBF followed that process when it swiftly denied his request, and

if it did, he asked about "what possible accommodations were identified."  *Id*.

Raymond also suggested some possible accommodations, including adjusting or reallocating assignments so that Raymond had fewer locations that required "extended driving"; alternatively, he proposed moving to a different position that did not require that much driving.  Joint App'x 195–96.

On February 4, Whitter responded that "a determination was made that [NBF] is unable accommodate the request because these restrictions would negatively impact [Raymond's] ability to perform the essential functions of [his] job as an Outreach Coordinator.  This determination has not changed."  Joint App'x 150.  He did not answer Raymond's question about company policy, nor did he engage with either of the two alternative solutions proposed by Raymond.

On February 6, 2019, unable to return to work without any restrictions, Raymond applied for long-term disability leave, and NBF immediately terminated his employment.  In a letter notifying Raymond of this decision, Kral explained that Raymond was being fired "[a]s a result of . . . [his] inability to return to work, without any restrictions."  Joint App'x 2564.  The letter noted that "if in the future [Raymond is] medically cleared to return to employment without restrictions," he was "welcome to apply for any suitable positions."  *Id*.

13

## II.    Procedural History

On December 8, 2020, Raymond commenced this suit in the Southern District of New York.  He alleged disability discrimination under the Americans with Disabilities Act, claiming that NBF violated the Act by: (1) denying his request for reasonable accommodations and (2) firing him due to his disability.

After mediation and discovery, NBF moved for summary judgment, seeking dismissal of Raymond's claims in their entirety.  On July 20, 2023, the court (Daniels, *J.*) granted in part and denied in part NBF's motion.

### A.    Failure-to-Accommodate Claim

The district court granted NBF summary judgment as to Raymond's failure-to-accommodate claim, finding that Raymond failed to show a genuine dispute of material fact that, while employed by NBF, NBF refused to make reasonable accommodations for his disability.  Although the district court agreed that Raymond was disabled and that NBF regarded him as disabled, it concluded that NBF "repeatedly accommodated [Raymond's] perceived disability," first by limiting the amount of heavy things Raymond had to carry, then by exempting

him from servicing the four farthest facilities.[3] *Raymond v. 1199SEIU Nat'l Benefit Fund*, No. 20-CV-10380 (GBD), 2023 WL 4637626, at *6 (S.D.N.Y. July 20, 2023) ("*Raymond I*").

In reaching this conclusion, the district court noted that "[e]mployers are not required to provide a perfect accommodation," nor are they required to "create a new position for an employee seeking an accommodation." *Id.* The court reasoned that the "only request that [NBF] refused was [Raymond's] transfer back to his previous assignment of Area J." *Id.* It found that this request was "not a plausible 'reasonable accommodation,'" because Raymond did not provide any evidence "that demonstrates [that] Area J as opposed to modified Area I could have resolved issues with his revised restrictions." *Id.* From this, Judge Daniels concluded that Raymond "present[ed] no evidence that [NBF] refused to make any specific reasonable accommodation that was necessary to enable [Raymond] to perform the essential functions of his job as an Outreach Coordinator." *Id.* at *7. And as for Raymond's January 17, 2019 email "requesting 'reasonable accommodations'" and his February 1, 2019 letter asking NBF to "identify possible accommodations," the district court found that

---

[3] Unless otherwise indicated, we omit all internal quotation marks, alteration marks, emphases, footnotes, and citations when quoting cases.

Raymond did not "reveal any *specific* accommodations that [he] requested which [NBF] failed to provide," and therefore Raymond did not sufficiently allege a genuine dispute of material fact as to whether NBF refused to make reasonable accommodations for his disability. *Id.* On this basis, the district court granted NBF's motion for summary judgment on Raymond's failure-to-accommodate claim.

The district court denied NBF's motion for summary judgment on the disability discrimination claim. In doing so, the court first recognized that Raymond "proffered sufficient evidence that he has a disability under the ADA," and that NBF had notice of Raymond's disability. *Id.* at *4. The court also acknowledged that "[t]he parties do not dispute that Defendant NBF is an employer subject to the ADA." *Id.* Nevertheless, it concluded that NBF failed to meet its burden of "demonstrat[ing] as a matter of law that [Raymond] was not fired because of his disability" by "show[ing] that [he] was either *incapable* or *unwilling* to do his job, . . . provid[ing] a non-discriminatory reason to terminate his employment." *Id.* Similarly, the district court also ruled that "a reasonable jury could find that [Raymond] was qualified to perform essential functions of

16

his job with reasonable accommodations." *Id.* at \*5. This claim therefore proceeded to trial.

### B.     Disability Discrimination Claim

Trial on Raymond's disability discrimination claim lasted from June 24, 2024, to July 1, 2024. On July 1, the jury returned a verdict for NBF, and the court entered judgment reflecting this verdict on July 2.

On July 30, 2024, Raymond filed a motion for a new trial under Rule 59(a), arguing that the jury's verdict contravened the weight of the evidence. He also asked the district court to amend its summary judgment order on the failure-to-accommodate claim under Rule 59(e). The district court denied Raymond's motion as to both granting a new trial and amending the summary judgment order.

As to the motion for a new trial, the district court found that "[t]here was sufficient evidence introduced at trial to support the jury's verdict that Raymond was not terminated due to his disability." *Raymond v. 1199 SEIU Nat'l Benefit Fund*, No. 20-CV-10380 (GBD) (GWG), 2025 WL 588412, at \*2 (S.D.N.Y. Feb. 24, 2025) ("*Raymond II*"). First, it analyzed whether Raymond's proposed alternatives constituted reasonable accommodations under the ADA. It

17

concluded that a reasonable jury could have found that NBF could not have reasonably accommodated Raymond by providing him with shorter driving routes or routes that allowed for frequent breaks, because (1) "[t]here was . . . no evidence presented" at trial—other than Raymond's own testimony—that alternative routes "covered any shorter distances" than his existing assignment; (2) "NBF was not required to reassign other coordinators or 'create' new areas to accommodate Raymond's restrictions"; and (3) "there [was] no evidence that Raymond suggested any . . . other . . . accommodations to NBF, besides returning to his original assignment, which was no longer available." *Id.* at *2, 3. Ultimately, the district court concluded that "NBF had already attempted to accommodate Raymond in accordance with its legal duty when it removed from his route the four farthest facilities in Area I." *Id.* at *3.

Next, the court analyzed whether the evidence presented at trial "unequivocally showed" that Raymond was terminated due to his disability. *Id*. Though it noted that "terminating an employee because they cannot return to work without restrictions . . . is a per se violation of the ADA," the court found that the "evidence did not support a finding that NBF actually had or enforced such a policy." *Id*. The district court based this conclusion not on NBF's internal

emails in the weeks before Raymond was fired that emphasized his need to return without restrictions, but on NBF's earlier communications that allowed Raymond to return to work with light restrictions.  **[SPA6.]**  And it went a step further, finding that not only did the evidence not show that NBF required Raymond to return to work without any restrictions or accommodations, but that "the evidence showed that NBF *did* attempt to accommodate Raymond's prolonged-driving restriction by removing the four farthest stops on his Area I route."  *Id.* (emphasis in original).  The district court therefore found that "the jury reasonably concluded that NBF's unwillingness to guarantee that Raymond would not have to drive more than thirty minutes at a time was not evidence of NBF's discriminatory animus against the disabled."  *Id*.  Rather, "NBF was in fact motivated by legitimate business judgment," and so "it was not unreasonable for the jury to conclude that NBF fired Raymond not because of his disability, but because he was unwilling or unable to do his assigned job."  *Id*.  The court denied Raymond's motion for a new trial.

The district court then denied Raymond's motion to amend the summary judgment order, finding that "he d[id] not present . . . any new information or evidence that [it] did not already consider at summary judgment."  *Id.* at *4.

19

And, reiterating its position in its summary judgment opinion, the district court reasoned that it "properly decided that there was no genuine issue of material fact as to Raymond's failure-to-accommodate claim" because (1) NBF did accommodate Raymond, "most notably by reassigning his four farthest facilities in Area I," and (2) Raymond did not show that he requested any accommodation other than a return to his old Area J assignment. *Id.*

## DISCUSSION

### I. Applicable Law

#### A. Standard of Review

"We review *de novo* a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021). Although we resolve ambiguities in favor of the nonmoving party, *Uviles v. City of New York*, 130 F.4th 27, 30–31 (2d Cir. 2025), "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment," *Kulak v. City of New York*, 88 F.3d 63, 70 (2d Cir. 1996). "Summary judgment is required if 'there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law.'" *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 192 (2d Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).

### B. Relevant Law

To prevail on a failure-to-accommodate claim under the ADA, an employee must show that:

> (1) [he] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the employee] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009). For the purpose of summary judgment, the district court in this case concluded that Raymond met his burden on the first two elements—that he is disabled within the meaning of the ADA and that NBF, an employer covered by the ADA, had notice of his disability. His appeal thus turns on the other two factors: whether (1) Raymond could perform his job with a reasonable accommodation and (2) NBF refused to make such accommodations.

In pertinent part, a reasonable accommodation under the ADA is one that "enable[s] an individual with a disability who is qualified to perform the

essential functions of that position; or . . . to enjoy equal benefits and privileges of employment."  29 C.F.R. §§ l630.2(o)(1)(ii)–(iii).[4]  Such accommodations may include, but are not limited to, "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities."  *Id.* § l630.2(o)(2)(ii).  "A covered entity is required, absent undue hardship, to provide a reasonable accommodation" to any employee who meets the definition of disability under the "actual disability" or "record of" prongs as defined by the regulations.  *Id.* § l630.2(o)(4); *see also id.* § 1630.2(g)(i) & (ii).[5]

---

[4] Regulations promulgated by the Equal Employment Opportunity Commission define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1) (clarifying that the term "does not include the marginal functions of the position"); *id.* § 1630.2(n)(2)–(3) (providing a non-exclusive list of reasons and evidence that would support a finding that a job function is essential).  Courts "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position."  *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998).  Ultimately, however, determining the essential functions of the job is a quintessential fact-bound inquiry best suited for the jury.  *See McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013).

[5] The regulations provide three alternative prongs of "disability" pursuant to which an individual may establish coverage: (i) the "actual disability" prong; (ii) the "record of"

"The hallmark of a reasonable accommodation is effectiveness." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015). To satisfy the ADA, an "accommodation need not be perfect or the one most strongly preferred by the [plaintiff], but it still must be effective." *Id*. "An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (emphases in original). That is, while an employer need not provide the exact accommodation requested by an employee, if the accommodation does not enable the disabled employee to perform the job's essential functions, that accommodation is not a reasonable one.

Still, a "'reasonable accommodation' does not mean elimination of any of the job's essential functions." *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991). In enacting the ADA, "Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons." *Wernick v. Fed. Rsrv. Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir. 1996). And to

---

prong; and (iii) the "regarded as" prong. 29 C.F.R. § 1630.2(g)(1)(i)–(iii). These definitions largely mirror and expand upon the statutory definitions of "disability" under the ADA. *See* 42 U.S.C. § 12102(1)(A)–(C). Again, because the district court found that Raymond demonstrated a disability under the ADA, these nuances are not outcome determinative for purposes of this appeal.

eliminate entirely an essential function of the job would be to favor individuals

with disabilities over those without. *See id.* at 384–85.

Ultimately, the process of a failure-to-accommodate claim is as follows:

First, if the employer provided an accommodation, the court examines

whether the provided accommodation was reasonable under the ADA—in other

words, whether it was "effective." *See Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89,

94–95 (2d Cir. 2015). If so, the inquiry stops there. *See id.* at 94.

If not, then the plaintiff bears the "burden of production," which requires

him to show the existence of a "plausible accommodation." *Barnett*, 535 U.S. at

402. To demonstrate the existence of a plausible accommodation at the summary

judgment stage, a plaintiff "need only show that an 'accommodation' seems

reasonable on its face." *Id.* at 401. Such a showing will "defeat a

defendant/employer's motion for summary judgment." *Id.* The burden then

shifts to the employer to show, at trial, that a particular accommodation "would

cause [the employer] to suffer an undue hardship." *Borkowski v. Valley Cent. Sch.

Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).

With these principles in mind, we turn to the issues before us on appeal.

## II.   Failure-to-Accommodate Claim

First, we must analyze whether NBF's accommodation—removing the four farthest facilities from Raymond's route—was reasonable under the ADA and our caselaw.[6]  Even if we conclude that it was not reasonable, our inquiry does not end there.  Because "we may affirm a grant of summary judgment on any basis that finds 'sufficient support in the record, including grounds not relied on by the district court,'" *Dean*, 804 F.3d at 189, we must further consider whether Raymond's proposed accommodations are reasonable on their face, *see Noll*, 787 F.3d at 94.

### A.   Removal of the Four Farthest Stops

We first conclude that the district court applied an incorrect legal standard when analyzing whether NBF's removal of the four stops was a reasonable accommodation under the ADA.

---

[6] Because determining the essential functions of Raymond's job is a quintessential fact-bound inquiry best suited for the jury, *see McMillan*, 711 F.3d at 126, for purposes of our assessment of the district court's summary judgment decision on the failure-to-accommodate claim, we assume without deciding that the essential functions of Raymond's job do not require driving for more than thirty minutes uninterrupted because that is a reasonable inference we can draw from the summary judgment record, *see Bey v. City of New York*, 999 F.3d 157, 164 (2d Cir. 2021).

The district court opinion granting summary judgment to NBF on the failure-to-accommodate claim stated that "[d]efendant repeatedly accommodated [Raymond's] perceived disability." *Raymond I*, 2023 WL 4637626, at *6. It noted that, after Raymond's December 2017 doctor's note recommended against prolonged sitting and driving, NBF reassigned Raymond's four farthest stops to another outreach coordinator. *Id.* The court then declared, without further analysis, that this reassignment "show[s] that [NBF] responded to [Raymond's] expressed needs," providing a reasonable accommodation, and "no reasonable jury could conclude that [NBF] refused to make reasonable accommodations in response to [Raymond's] requests." *Id.* at *6–7. But *any* action taken by an employer, even one that reduces the employee's workload or addresses some of the employee's needs, is not necessarily a reasonable accommodation. Rather, to qualify as a reasonable accommodation, the accommodation "must be effective." *Dean*, 804 F.3d at 189. Or, to state it differently, if the employer's response does not "*accommodate* a disabled individual's limitations," the response is "ineffective." *Barnett*, 535 U.S. at 400.

To be an effective accommodation, then, the removal of the four stops must address Raymond's physical limitations and enable him to perform the

26

essential functions of his job. Because the district court did not consider whether the route change accommodated Raymond's limitations, and instead apparently treated any action that NBF took to respond to Raymond's request as a reasonable accommodation, it applied an incorrect legal standard.

But even using the correct standard, we cannot say whether removing the four stops was a reasonable accommodation. Whether a given accommodation is reasonable is a "'fact-specific' question that often must be resolved by a factfinder." *Noll*, 787 F.3d at 94. In other words, "determinations on this issue must be made on a case-by-case basis," *Wernick*, 91 F.3d at 385, and often cannot be resolved at summary judgment.

Many questions of fact remain. First, the record is unclear as to the extent of Raymond's limitations. While his June 27, 2018 doctor's note does suggest that Raymond cannot drive for more than thirty minutes at a time, it is up to the jury to decide whether the note accurately described Raymond's physical limitations. *See Tafolla v. Heilig*, 80 F.4th 111, 122–23 (2d Cir. 2023); *see also Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]nsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment."). At trial, NBF would have the

opportunity to present any evidence that may contradict the doctor's note, and the jury, as fact-finder, could determine what weight, if any, to give the note.[7]

Second, even if it were undisputed that Raymond cannot sit for more than thirty minutes at a time, there is a dispute of fact as to whether his assignment in Area I required him to drive uninterrupted for longer than that. By NBF's own account, removing the four farthest stops still left Raymond with at least nine facilities that were over thirty minutes away from Raymond's home. *See* Joint App'x 2636–37 (internal email acknowledging that after the route changes, Raymond's area still included "9 shops less than 1 hour drive" but more than thirty minutes from Raymond's home, "5 shops less than 1:15min drive," and "2 shops more than 1:30 min" from his home). But the parties dispute whether these facility visits required more than thirty minutes of *continuous* driving. *Compare, e.g., id.* at 1081 (fellow Outreach Coordinator testifying that he could "pull over" and "stretch" during his drives), *with id.* at 256 (Raymond's affidavit stating that "outreach coordinators are not permitted to take breaks while

---

[7] NBF did, at trial, proffer evidence to cast doubt on Raymond's alleged physical limitations. But that evidence does not appear to be in the summary judgment record. We therefore decline to credit it, and leave it up to the district court on remand to decide whether to reopen the summary judgment record (for this and other contested facts) or to proceed to trial on the failure-to-accommodate claim.

traveling").   The extent of Raymond's physical limitations and whether NBF's response reasonably accommodated them are therefore questions of fact for the district court and the jury, as finder of fact, to consider on remand.

### B.    Raymond's Proposed Accommodations

Even if we cannot conclude that, as a matter of law, NBF provided reasonable accommodations as required under the ADA, NBF can still prevail if Raymond did not meet his burden at the summary judgment stage that any facially reasonable accommodations existed.

The district court determined that Raymond had proposed "only" one alternative accommodation: reassignment back to Area J.  *Raymond I*, 2023 WL 4637626, at *6.  It concluded that the request was not a "plausible" one because "[t]here is no evidence that Area J is materially different from [NBF's] prior accommodation of removing the four farthest facilities in Area I."  *Id*.  But there is evidence in the record supporting an inference that Area J requires less driving.  A map of Area J and Area I shows that the facilities in Area J are concentrated in Queens and western Long Island, closer to Raymond's home. Area I, by contrast, is spread across middle and eastern Long Island.  Even if you remove the four farthest stops, a reasonable jury could interpret the map as

showing that, at least measured by distance, Raymond's assignment to Area I

requires longer drives than Area J. And Raymond himself testified that Area J

would have required "less driving."[8] Joint App'x 109. Raymond also testified

that because the drives in Area J allowed him to take local roads, he could pull

over and rest his legs as needed, which he claimed he could not do in Area I.

NBF argues that Raymond's request to be reassigned back to Area J is not a

plausible accommodation because Area J was not a vacant position. It is true

that, as an example of acceptable accommodations, the regulations promulgated

by the Equal Employment Opportunity Commission ("EEOC") list

"reassignment to a *vacant* position." 29 C.F.R. § l630.2(o)(2)(ii) (emphasis added).

And "accommodation is reasonable only if its costs are not clearly

disproportionate to the benefits that it will produce." *Borkowski*, 63 F.3d at 138.

But we think that NBF's argument is flawed for two reasons.

First, a reasonable jury could conclude that Raymond is not requesting to

be transferred to a new position: His position is Outreach Coordinator; he may

---

[8] The district court acknowledged this testimony, but seems not to have credited it. At the summary judgment stage, this appears to have been error. *See McMillan*, 711 F.3d at 127–28 (relying solely on plaintiff's testimony that his proposed accommodation would allow him to perform the essential functions of his job to defeat summary judgment).

merely be asking to be given a new *assignment* under that position. Indeed, neither the ADA nor the EEOC regulations define the term "position" or "assignment." So while normally a "plaintiff seeking to hold the employer liable for failing to transfer [him] to a vacant position as a reasonable accommodation must demonstrate that there was a vacant position into which [he] might have been transferred," *Jackan v. N.Y. State Dep't of Lab.*, 205 F.3d 562, 567 (2d Cir. 2000), such a requirement may not apply here.

Second, even if we view the "position" as filled, which ordinarily defeats an employee's claim, a normally unreasonable accommodation can be found to be reasonable, on a case-by-case basis, where the employee's desired accommodation aligns with company practice. *C.f. Barnett*, 535 U.S. at 404–05 (reasoning that while a requested accommodation may be unreasonable where it requires an employer to bypass its seniority system, that same accommodation may be reasonable if the employer frequently ignores the seniority system such that "one more departure . . . will not likely make a difference"). In other words, if NBF frequently shuffles employees into non-vacant positions, then Raymond's reassignment request might be a plausible accommodation.

It is clear from the record that Sossi, Raymond's boss, frequently reassigned outreach coordinators to different areas. What is not clear, however, is whether this was only done to fill existing vacancies, or whether areas were frequently passed between existing outreach coordinators. And that detail matters. "[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled." *Wernick*, 91 F.3d at 385. Thus, if NBF never shuffles around the assignments of existing outreach coordinators, then Raymond's proposal to switch back to Area J—which was being serviced by his colleague—would appear to be one that gives him an unfair priority in reassignment. The district court must determine, on remand, whether this request is plausible, keeping in mind that the plaintiff

bears only a "light burden of production" as to the facial reasonableness of a proposed accommodation.[9] *McBride*, 583 F.3d at 97 n.3.

## III. Disability Discrimination Claim

Raymond also argues that the district court erred in denying his Rule 59(a) motion for new trial. But this denial is not an appealable order.

Our caselaw on this issue is somewhat confounding. Just last year, we concluded that there is "ambiguity in our precedents" regarding whether a district court's denial of a Rule 59(a) motion for a new trial on weight-of-the-evidence grounds is reviewable. *See Ortiz v. Stambach*, 137 F.4th 48, 71 (2d Cir. 2025) (collecting cases). We doubt, though, that our precedents can be viewed that way. Instead, we conclude that our precedents firmly establish that such a denial is not reviewable on appeal.

---

[9] In his email requesting to be moved back to Area J, Raymond also proposed another accommodation in addition to area reassignment—assignment to a different position altogether. *See* Joint App'x 195–96 (Raymond asking whether NBF considered moving him to a job that "require[d] less extended driving" (internal quotation marks omitted)). Because Raymond "bears the burden of proving that such a vacancy existed," *Jackan*, 205 F.3d at 564, and because Raymond identified no such open positions, this request is not plausible on its face. Additionally, in his briefs before us, Raymond suggests that NBF's "refusal to engage in an interactive process" regarding possible accommodations "resolve[s] the issue in [] Raymond's favor on summary judgment." Appellant's Br. at 38 n.8. At oral argument, however, Raymond's counsel disclaimed an interactive process claim, *see* Oral Arg. at 1:10–1:35, and so we do not consider the issue here.

We have made the (seemingly odd, we think) distinction that:

> appellate review of a district court's decision as to whether a jury verdict was against the weight of evidence "is warranted in the rare case where a trial judge rejects a jury's verdict as against the weight of the evidence . . . but is not warranted in the far more frequent circumstance where a trial judge denies a 'weight of the evidence' challenge and leaves in place a jury verdict supported by legally sufficient evidence.  In the latter circumstance, the loser's only appellate recourse is to challenge the legal sufficiency of the evidence.  The loser is also entitled to argue to the trial judge that the verdict is against the weight of the evidence and to obtain a new trial if the judge can be persuaded, but the denial of that challenge is one of those few rulings that is simply unavailable for appellate review."

*Ferreira v. City of Binghamton*, 975 F.3d 255, 265–66 (2d Cir. 2020) (quoting

*Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1199 (2d Cir. 1995)).

In other words, *Ferreira* reads *Stonewall* as saying that the reviewability of a Rule 59(a) weight-of-the-evidence decision depends on the outcome of the district judge's decision:  If the district judge *overturns* the jury verdict on weight-of-the-evidence grounds, it is reviewable; if the judge *upholds* a jury verdict over a losing party's motion that the verdict contravenes the weight of the evidence, that decision is not reviewable.  That is, if a district court denies a Rule 59(a) motion to vacate a verdict, we cannot review that denial.

Raymond's appeal of the district court's denial of his Rule 59(a) motion on weight-of-evidence grounds is exactly the type of challenge that *Stonewall* and *Ferreira* forbid. Because we cannot review the district court's order, we must dismiss for lack of appellate jurisdiction. *See Dutch Am. Mercantile Corp. v. Eighteenth Ave. Land Co.*, 302 F.2d 636, 637 (2d Cir. 1962).

\*\*\*

We do note, however, what seems to us as oddness of this non-reviewability precedent. All of our sister circuits appear to allow review of Rule 59(a) motions where a judge denies a losing party's weight-of-the-evidence motion. *See, e.g., Correia v. Fitzgerald*, 354 F.3d 47, 54 (1st Cir. 2003); *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016); *Gray v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 551 F. App'x 666, 675 (4th Cir. 2014); *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008); *Mys v. Mich. Dep't of State Police*, 886 F.3d 591, 599 (6th Cir. 2018); *Saathoff v. Davis*, 826 F.3d 925, 933 (7th Cir. 2016); *Russell v. Anderson*, 966 F.3d 711, 724 (8th Cir. 2020); *Williams v. Gaye*, 895 F.3d 1106, 1127 (9th Cir. 2018); *Escue v. N. OK Coll.*, 450 F.3d 1146, 1156–57 (10th Cir. 2006); *Dudley v. Wal-Mart Stores, Inc.*, 166 F.3d 1317, 1320 (11th Cir. 1999); *Curry v. Dist. of Columbia*, 195 F.3d 654, 658–59 (D.C. Cir. 1999); *Lubby Holdings LLC v. Chung*, 11 F.4th 1355,

1361 (Fed. Cir. 2021).  But of course, this panel is bound by our current

precedent.[10]

## CONCLUSION

We have considered the parties' remaining arguments on appeal and

conclude that they are without merit.  For the reasons explained above, we

**VACATE** the district court's entry of summary judgment, **DISMISS** the appeal

of the district court's order on Raymond's Rule 59(a) motion, and **REMAND** for

further proceedings consistent with this opinion.

---

[10] We must follow the precedent laid out by our Court "unless and until it is reconsidered by our court sitting in banc (or its equivalent) or is rejected by a later Supreme Court decision."  *United States v. Sterkaj*, 138 F.4th 95, 99 (2d Cir. 2025).